COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Benton, Elder,
          Annunziata, Bumgardner, Frank, Humphreys, Clements,
          Felton and Kelsey
Argued at Richmond, Virginia


JERALD LORENZO JACKSON
                                          OPINION BY
v.        Record No. 3238-01-1     JUDGE D. ARTHUR KELSEY
                                          JULY 29, 2003
COMMONWEALTH OF VIRGINIA


UPON REHEARING EN BANC

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
                Randolph T. West, Judge

     Mark L. Williams for appellant.

     Susan M. Harris, Assistant Attorney General
     (Jerry W. Kilgore, Attorney General, on brief),
     for appellee.


     The trial court found the appellant, Jerald Lorenzo

Jackson, guilty of possession of cocaine (Code § 18.2-250),

possession of a concealed weapon (Code § 18.2-308), and

possession of a firearm while simultaneously possessing illegal

drugs (Code § 18.2-308.4(A)).  On appeal, Jackson challenges

only the trial court's denial of his pretrial suppression

motion.  A divided panel of the Court affirmed the conviction.

Jackson v. Commonwealth, 39 Va. App. 624, 576 S.E.2d 206 (2003).

Upon rehearing the matter en banc, we likewise affirm the trial

court, finding no error in either its analysis or conclusion.

On appeal from a denial of a suppression motion, we must review the evidence in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences. Bass v. Commonwealth, 259 Va. 470, 475, 525 S.E.2d 921, 924 (2000); Sabo v. Commonwealth, 38 Va. App. 63, 69, 561 S.E.2d 761, 764 (2002).

At 2:10 a.m. on June 17, 2001, the Newport News Police Department dispatched Officer M.A. Cook to a street corner next to a "small bar" to investigate an anonymous complaint. The caller reported (and the dispatcher advised the responding officers) that "three black males" were acting disorderly and "at least one of them had a firearm and was brandishing it." The caller also stated that the three "were getting into a car and leaving." The caller described the vehicle as a "white Honda." Sending backup, the police interpreted the report as "a high risk situation with a gun possibly involved."

Three to five minutes later, Cook and other officers arrived at the scene and observed a white Honda leaving the area. They saw no other white vehicles of any type. The white Honda "pulled out right in front" of Cook, permitting the headlights of his police cruiser to shine directly into the vehicle. Cook clearly saw three black males in the white Honda. On the basis of the brandishing tip, the officers followed the vehicle and stopped it several blocks away.

Cook approached the car and explained the reason for the stop. Sergeant James Hogan went to the passenger side of the vehicle and shined a light into the car. Jackson sat in the front passenger seat with his arms folded across his stomach. Hogan noted an unusual bulge underneath Jackson's shirt, which the officer suspected to be a firearm. The bulge, Hogan concluded, "obviously was not part of his body" and was "too big" to be anything other than a handgun.

Hogan asked Jackson if he had a gun on him. Jackson said no. Hogan then said, "Could you pull your shirt up so that I can be comfortable with us talking, because I believe you have a firearm?" In response, Jackson pulled his shirt "a couple inches and put it back" and then "crossed his arms back across his stomach."

Fearing for his safety, Hogan unholstered his sidearm and ordered Jackson out of the car. After Jackson got out of the vehicle, Officer B.D. Bartley immediately conducted a weapons search and removed a Glock, .40 caliber, semiautomatic handgun from Jackson in the exact area of the previously noticed bulge. The officers then handcuffed Jackson and placed him under arrest. In a search incident to his arrest, the officers also found crack cocaine in Jackson's pants pocket.

## II.

At trial, Jackson moved to suppress the evidence, claiming that the police officers (i) lacked a sufficient basis to stop

- 3 -

the white Honda and to question its occupants, and (ii) had equally insubstantial grounds for searching him for weapons or drugs. Both events, Jackson contended, violated search and seizure principles protected by Virginia law and the United States Constitution.[1]

The trial court denied the motion, stating that the officers had "an obligation to protect the citizens of this community" and would have been "derelict in their duty" had they not acted as they did. The procedures they followed, the trial judge concluded, were "strictly by the book." For the following reasons, we agree with the trial court and affirm its decision.

### A.

Though the ultimate question whether the officers violated the Fourth Amendment triggers de novo scrutiny, we defer to the trial court's findings of "historical fact" and give "due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." Davis v. Commonwealth, 37 Va. App. 421, 429, 559 S.E.2d 374, 378 (2002) (citing Neal v.

---

[1] See generally Code § 19.2-60 ("A person aggrieved by an allegedly unlawful search or seizure may move the court . . . to suppress it for use as evidence."). To the extent Jackson invokes constitutional guarantees arising under Article I, § 10 of the Virginia Constitution, the state law analysis tracks the federal law interpreting the Fourth Amendment of the United States Constitution. See Henry v. Commonwealth, 32 Va. App. 547, 551, 529 S.E.2d 796, 798 (2000). "Our courts have consistently held that the protections afforded under the Virginia Constitution are co-extensive with those in the United States Constitution." Sabo, 38 Va. App. at 77, 561 S.E.2d at 768 (citation omitted); see also Bennefield v. Commonwealth, 21 Va. App. 729, 739-40, 467 S.E.2d 306, 311 (1996).

- 4 -

Commonwealth, 27 Va. App. 233, 237, 498 S.E.2d 422, 424 (1998)).

Viewing the case through this evidentiary prism, we examine the trial court's factual findings to determine if they are plainly wrong or devoid of supporting evidence.  See Mier v. Commonwealth, 12 Va. App. 827, 828, 407 S.E.2d 342, 343 (1991). The appellant must shoulder the "burden" of showing that the trial court's decision "constituted reversible error."  McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (en banc) (citations omitted); see also Davis, 37 Va. App. at 429, 559 S.E.2d at 378.

B.

The Fourth Amendment "does not proscribe all seizures, only those that are 'unreasonable.'"  Hodnett v. Commonwealth, 32 Va. App. 684, 690, 530 S.E.2d 433, 436 (2000) (quoting Welshman v. Commonwealth, 28 Va. App. 20, 30, 502 S.E.2d 122, 126-27 (1998) (en banc)); see also Hamlin v. Commonwealth, 33 Va. App. 494, 499, 534 S.E.2d 363, 365 (2000).  The Constitution simply "does not proscribe reasonable searches and seizures."  Barkley v. Commonwealth, 39 Va. App. 682, 691, 576 S.E.2d 234, 238 (2003).  The text of the Fourth Amendment draws the line there; so too must the courts.

In this context, reasonableness depends on the extent of the individual's loss of freedom caused by the seizure and the objective reason for it.  A full custodial arrest requires a showing of probable cause.  When police officers merely stop an

automobile, however, they need only have a reasonable, articulable suspicion that the driver is unlicensed, the automobile unregistered, or the "person stopped may be involved in criminal activity."  Bass, 259 Va. at 474-75, 525 S.E.2d at 923-24 (citations omitted).[2]  Actual proof that "criminal activity is afoot is not necessary," only that it "may be afoot."  Harmon v. Commonwealth, 15 Va. App. 440, 444, 425 S.E.2d 77, 79 (1992); see also United States v. Arvizu, 534 U.S. 266, 273 (2002); Hamlin, 33 Va. App. at 501, 534 S.E.2d at 366. Though an officer's reliance on a mere hunch cannot justify a stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Arvizu, 534 U.S. at 274.[3]

---

[2] When police officers "'stop a motor vehicle and detain an occupant, this constitutes a seizure of the person for Fourth Amendment purposes.'"  Logan v. Commonwealth, 19 Va. App. 437, 441, 452 S.E.2d 364, 367 (1994) (quoting Zimmerman v. Commonwealth, 234 Va. 609, 611, 363 S.E.2d 708, 709 (1988)). After making a lawful stop of a vehicle and questioning its occupants, an officer may order a passenger out of the vehicle. See Maryland v. Wilson, 519 U.S. 408, 415 (1997); Harris v. Commonwealth, 27 Va. App. 554, 561-63, 500 S.E.2d 257, 260-61 (1998); Welshman, 28 Va. App. at 31-32, 502 S.E.2d at 127-28; Hatcher v. Commonwealth, 14 Va. App. 487, 491-92, 419 S.E.2d 256, 258-59 (1992).

[3] See also Parker v. Commonwealth, 255 Va. 96, 104, 496 S.E.2d 47, 51-52 (1998) (recognizing that an investigatory detention may take place "even though there is no probable cause to make an arrest," citing Terry v. Ohio, 392 U.S. 1, 22 (1968)); Clarke v. Commonwealth, 32 Va. App. 286, 295, 527 S.E.2d 484, 488 (2000) (noting that the test for reasonable suspicion is "less stringent than the test for probable cause").

Under equally settled principles, "anonymous information that has been sufficiently corroborated may furnish reasonable suspicion justifying an investigative stop." Bulatko v. Commonwealth, 16 Va. App. 135, 137, 428 S.E.2d 306, 307 (1993) (citing Alabama v. White, 496 U.S. 325, 331 (1990)). "An informant's tip can provide the justification for a Terry stop even if the informant's reliability is unknown and certainly can do so if, as here, the information is corroborated." Washington v. Commonwealth, 29 Va. App. 5, 11, 509 S.E.2d 512, 515 (1999) (en banc) (citation omitted). "Anonymous information sufficiently corroborated may give reasonable suspicion for an investigative stop although the unverified tip by itself would not justify a forcible stop." Washington, 29 Va. App. at 12, 509 S.E.2d at 515.

Described as "the classic case on the value of corroborative efforts of police officials," Illinois v. Gates, 462 U.S. 213, 242 (1983), the United States Supreme Court decision in Draper v. United States, 358 U.S. 307 (1959), involved a known informant who reported that the suspect would be arriving on a particular train, wearing certain kinds of clothes, carrying particular pieces of luggage, would walk briskly, and "would be carrying a quantity of heroin." Gates, 462 U.S. at 242. The informant "gave no indication of the basis for his information." Id. The police verified all of these details except the allegation that the suspect had "heroin on

his person or in his bag." Gates, 462 U.S. at 243. By itself, however, this omission did not invalidate the reliability of the tip. As the Supreme Court explained,

> with every other bit of [the informant's] information being thus personally verified, [the officer] had "reasonable grounds" to believe that the remaining unverified bit of [the informant's] information —— that [the suspect] would have the heroin with him —— was likewise true.

Id. (quoting Draper, 358 U.S. at 313); see also Boyd v. Commonwealth, 12 Va. App. 179, 189, 402 S.E.2d 914, 920 (1991) ("The verification of the personal information becomes, then, but another circumstance the [officer] may consider in determining whether the informer is to be believed. It is a factor which reduced the chances that [the informer's report was] a reckless or prevaricating tale." (citing Gates, 462 U.S. at 244-45) (internal quotations omitted)).

The Fourth Amendment has never required that the same inflexible rule of reliability be applied to all cases involving informants. "Rigid legal rules are ill-suited to an area of such diversity. 'One simple rule will not cover every situation.'" Gates, 462 U.S. at 232 (quoting Adams v. Williams, 407 U.S. 143, 147 (1972)). Even the reasonable suspicion standard itself, a "somewhat abstract" and "'elusive concept,'" cannot be reduced to a "'"neat set of legal rules."'" Arvizu, 534 U.S. at 274 (quoting Ornelas v. United States, 517 U.S. 690, 695-96 (1996), and Gates, 462 U.S. at 232 (additional citation

omitted)).  Given the flexibility inherent in the concept of reasonableness, the level of corroboration required by the Fourth Amendment depends on commonsense principles.  In this case, three such principles stand out.

First, citizens who witness a crime in progress are presumed personally reliable, and thus, courts do "not apply to citizen informers the same standard of reliability as is applicable when police act on tips from professional informers or those who seek immunity for themselves . . . ."  Guzewicz v. Commonwealth, 212 Va. 730, 735-36, 187 S.E.2d 144, 148 (1972).  Information from a "disinterested citizen" who claims to be an eyewitness of a crime may be given more weight than "information from a 'criminal' informer, whose motives are less likely to be pure."  Reed v. Commonwealth, 36 Va. App. 260, 267-68, 549 S.E.2d 616, 619-20 (2001); see also McCreary v. Sigler, 406 F.2d 1264, 1269 (8th Cir. 1969) ("Probable cause for an arrest may exist where an unknown citizen makes complaints, as a victim or eyewitness to a crime, where the underlying circumstances demonstrate his first-hand personal knowledge.").

Put another way, a call from a concerned citizen who witnesses a crime requires not so much "personal reliability" of the observer, but "observational reliability" of his observations.  State v. Walshire, 634 N.W.2d 625, 629 (Iowa 2001); see also State v. Williams, 623 N.W.2d 106, 115 (Wis.), cert. denied, 534 U.S. 949 (2001).  Observational reliability

exists where the police can corroborate significant details, the corroboration takes place soon after the alleged observation, and the eyewitness report is something that could have been seen had it happened as described.[4]  As we said in Beckner v. Commonwealth, 15 Va. App. 533, 537, 425 S.E.2d 530, 533 (1993), albeit in dicta, an anonymous report that a suspect is "displaying a gun" implies a "personal basis of knowledge" upon which reasonable officers may rely.

Second, the Fourth Amendment requirement of corroboration also takes into account whether the alleged illegality involves a concealed crime or an open and obvious crime.  It matters a great deal if the illegality alleged in the tip "'did not involve a concealed crime — a possessory offense.'"  United States v. Wheat, 278 F.3d 722, 734 (8th Cir. 2001) (quoting State v. Boyea, 765 A.2d 862, 875 (Vt. 2000) (Skoglund, J., concurring)), cert. denied, 533 U.S. 917 (2002).  If what was "described in the police dispatch to the arresting officer was a crime in progress, carried out in public, identifiable and observable by anyone," the anonymous tip may not need the same

---

[4] See, e.g., Gregory v. Commonwealth, 22 Va. App. 100, 107, 468 S.E.2d 117, 121 (1996) ("Accordingly, a detailed description, like that given here, by a caller who appears to have been a concerned citizen who recently observed a person hailing motorists to sell drugs, together with immediate verification of aspects of the description are important factors to consider in determining whether the officer had reasonable suspicion, even when the description contains facts that are 'easily obtained.'").

species of corroboration required for reports of concealed

crimes.  Id.

    In other words, what may be reasonable corroboration for

tips alleging an open and obvious crime (particularly from a

caller claiming to be an eyewitness) may be unsatisfactory for

those asserting a concealed crime.  For concealed crimes, the

tip may need some insider information capable of predicting the

suspect's actions.  This conclusion stems from the truism, noted

in White, 496 U.S. at 332, that when a tipster has knowledge of

information about the suspect which the "general public would

have no way of knowing," then it can be reasonably inferred that

the tipster "is likely to also have access to reliable

information about that individual's illegal activities."  In

such cases, the tip becomes more reliable to the extent it

reveals "inside information" demonstrating a "special

familiarity" with the suspect's affairs.  Id.

    When an anonymous caller reports an open and obvious crime

(like when a suspect brandishes a weapon or, for that matter,

shoots someone), the Fourth Amendment may require no showing

that the caller have inside information about the suspect

capable of predicting his future conduct.[5]  A "careful reading"

_____

    [5] We made a similar point in response to an appellant who
argued that White established an inflexible rule that
"information supplied to the government by an unidentified
informant may not establish reasonable suspicion to effect an
investigative stop, unless the information predicts the future
actions of the individual stopped."  Beckner, 15 Va. App. at
535, 425 S.E.2d at 531.  Our response was unequivocal:  "We

of the United States Supreme Court's cases shows that the "emphasis on the predictive aspects of an anonymous tip may be less applicable to tips purporting to describe contemporaneous, readily observable criminal actions . . . ." Wheat, 278 F.3d at 734. In such cases, the duty to corroborate focuses mainly on whether the tipster has accurately identified the suspect and described the illegality. "Almost always, it comes from his eyewitness observations, and there is no need to verify that he possesses inside information." Id.

Third, the reasonable corroboration standard also takes into account the seriousness of the danger posed by the alleged illegality. On several occasions "we have recognized a line of cases where courts have found reasonable suspicion for an investigatory stop when the public is in imminent danger, despite the fact that the stop is based on information provided by an anonymous informant who has not provided any basis of knowledge." Scott v. Commonwealth, 20 Va. App. 725, 728, 460 S.E.2d 610, 612 (1995) (citations omitted); see also Ramey v. Commonwealth, 35 Va. App. 624, 633, 547 S.E.2d 519, 524 (2001) ("We have applied an imminent danger standard in reviewing the sufficiency of an anonymous tip where there is a contemporaneous

---

disagree with the appellant on this point. We believe that a finding of reasonable suspicion may be warranted in some circumstances, despite the unidentified informant not providing the government with information that predicts the future actions of the subject, if some other indicia of reliability of the informant exists." Id.

description of dangerous criminal activity such as brandishing a firearm in a public place."). In such cases, the "imminent public danger" may provide ample justification for an "immediate investigation." Beckner, 15 Va. App. at 538, 425 S.E.2d at 534; cf. Giles v. Commonwealth, 32 Va. App. 519, 524-25, 529 S.E.2d 327, 330 (2000) (considering the "imminence of serious and perhaps lethal danger" as a factor in Terry stop analysis).

C.

In light of these principles, we reject Jackson's argument that the police had no authority to stop the white Honda and to question its occupants. The officers received a dispatch stating that three black males in a white Honda had been observed acting disorderly and one had been seen "brandishing" a firearm. On its face, the report alleged open and obvious criminal behavior. Brandishing a firearm means displaying it "in such manner as to reasonably induce fear in the mind of another or hold[ing] a firearm in a public place in such a manner as to reasonably induce fear in the mind of another of being shot or injured." Code § 18.2-282(A). The ordinary meaning of the word tracks its statutory definition. Brandishing a firearm means to "wave, shake, or exhibit in a menacing, challenging, or exultant way." Webster's New World Dictionary 170 (3d college ed. 1988).

That leaves only one issue: Did the officers sufficiently corroborate the information in the call? The trial court

- 13 -

correctly found that they did.  The caller reported six significant details:  the make of the vehicle (Honda), its color (white), its location (leaving the bar), the number of the occupants in the car (three), the race of each of the occupants (black), and the gender of each of the occupants (males). Having corroborated each of these details, within minutes of the original report, the police had an objectively reasonable belief that the remaining portion of the tip —— that one of the suspects had brandished a firearm only moments before —— was likewise true.  It is hardly unreasonable to believe that because an informant is "right about some things, he is more probably right about other facts," including the assertion that the suspect is engaged in "illegal activity."  Gates, 462 U.S. at 244 (quoting Spinelli v. United States, 393 U.S. 410, 427 (1969) (White, J., concurring)).

    Although the information came from a concerned citizen making an anonymous call to the police, this fact strengthens, not weakens, the reliability of the tip.  No information suggests the unknown caller was a paid informant or a known criminal tipster.  More important, the caller claimed he observed one of the disorderly suspects "brandishing" the weapon and then "getting into a car and leaving."  The caller described the events in the first person, reporting his personal observations about events then occurring.  The tip in our case, moreover, involved an open and obvious illegality.  By

- 14 -

definition, brandishing must be visible.  Thus, anyone outside

the bar (or inside the bar looking out the window) could have

seen it.[6]

Jackson's argument to the contrary fails to calibrate his

disagreement at the relevant level of persuasion.  For a mere

investigatory detention, the Fourth Amendment does not require a

showing that the suspicion of illegality be more likely true

than not.  Arvizu, 534 U.S. at 273-74.  Nor, for that matter,

need there be even the lesser showing that probable cause exists

for such a belief.  Id.  There simply must be a reasonable

suspicion, not one based on a mere guess or instinctual hunch.

The sufficiency of the corroboration, therefore, need only be

great enough to elevate the suspicion from an unfounded

supposition to a reasonable one.

Jackson contends our reasoning has been undermined by

Florida v. J.L., 529 U.S. 266 (2000).  We disagree.  The only

"question presented" in that case — according to the United

_____

[6] For these reasons, we do not see any favorable comparison
between this case and Ramey, 35 Va. App. at 627, 547 S.E.2d at
521, where the anonymous tip did not involve either a
contemporaneous or an eyewitness report.  Instead, the tip in
Ramey simply stated that a "black male was 'somehow' involved in
a fatal gang shooting the previous day, but relayed no further
information as to the source of the report or in what capacity
the black male was involved in the shooting."  Id.  We found
this tip legally insufficient for fairly obvious reasons.  An
anonymous tip claiming a suspect had "somehow" committed a crime
"the previous day," however, is quite different from an
eyewitness report that a suspect is committing a crime at that
very moment — particularly when the police provide near
immediate corroboration of a half-dozen observational details
contained in the report.

- 15 -

States Supreme Court — was "whether an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer's stop and frisk of that person." Id. at 268 (emphasis added); see also Commonwealth v. Hill, 264 Va. 541, 545, 570 S.E.2d 805, 807 (2002). The anonymous call reported only "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." J.L., 529 U.S. at 268. As J.L. correctly put it, the "tipster did not even allege that a crime was being committed." Brief for Respondent, Florida v. J.L., 1998 U.S. Briefs LEXIS 1993 at *4 (Jan. 25, 2000).

In other words, the tip in J.L. did not contain "a specific description of dangerous criminal conduct either under way or likely to occur." Ramey, 35 Va. App. at 633, 547 S.E.2d at 524 (describing the deficiency in the J.L. tip). Reasonable suspicion "requires that a tip be reliable in its assertion of illegality," not just in its ability to identify a particular suspect. Hill, 264 Va. at 545, 570 S.E.2d at 807 (quoting J.L., 529 U.S. at 272). The holding of J.L. turns on this very point:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

J.L., 529 U.S. at 272 (emphasis added).  J.L. cited with
approval a leading text that distinguishes "reliability as to
identification, which is often important in other criminal law
contexts, from reliability as to the likelihood of criminal
activity, which is central in anonymous-tip cases."  Id.
(summarizing 4 W. LaFave, Search and Seizure § 9.4(h), at 213
(3d ed. 1996)).

This fact alone distinguishes J.L. from our case.  Absent
some disqualifying status (being a felon, juvenile, or drug
possessor) or situs (being in a place where weapons are
forbidden), it is not a crime to possess a weapon.  The tipster
in J.L., therefore, made no reliable assertion of illegality.[7]
On the other hand, no matter one's status or situs, it is a
crime to brandish a firearm in a public place.  And that is
exactly what the tipster in our case asserted in a
contemporaneous, eyewitness report.  We thus see a substantial

---

[7] The officers in J.L. did not discover the illegality of
J.L. "carrying a gun" until after they detained J.L. and
determined he was a juvenile and, in any event, did not possess
a concealed weapon permit.

> That the allegation about the gun turned out
> to be correct does not suggest that the
> officers, prior to the frisks, had a
> reasonable basis for suspecting J.L. of
> engaging in unlawful conduct:  The
> reasonableness of official suspicion must be
> measured by what the officers knew before
> they conducted their search.

J.L., 529 U.S. at 271.

- 17 -

difference between the tip in J.L. (a man is carrying a gun) and the tip in our case (a man is pointing a gun at people).[8]

The "carrying a gun" shorthand expression in J.L., moreover, should not be mistakenly interpreted as "brandishing" a gun. The Florida Supreme Court, affirmed by the United States Supreme Court, made clear that the officers "received an anonymous tip that a young man was carrying a concealed weapon." J.L. v. Florida, 727 So. 2d 204, 207 (Fla. 1998) (emphasis added). The Florida Court of Appeals also confirmed that the "police received an anonymous complaint that a concealed weapon violation was taking place." Florida v. J.L., 689 So. 2d 1116, 1117 (Fla. Dist. Ct. App. 1997) (emphasis added). The United States Supreme Court granted certiorari on a single question presented, whether a tip alleging "a person is carrying a concealed firearm" passed the reliability test. Brief for Petitioner, Florida v. J.L., 1998 U.S. Briefs LEXIS 1993 at *i (Dec. 23, 1999) (emphasis added). Not one time in any of the judicial opinions or legal briefs accompanying J.L. to the

---

[8] The reason J.L. nevertheless engaged the reliability analysis was because reasonable suspicion, under the totality of the circumstances test, requires that both "quantity and quality" factors be considered, allowing for the "requisite quantum" of one to affect necessarily the other. White, 496 U.S. at 330. A footnote in J.L. notes that the "mere fact that a tip, if true, would describe illegal activity does not mean that the police may make a Terry stop without meeting the reliability requirement." J.L., 529 U.S. at 273 n.*. This unremarkable proposition simply means that an anonymous tip must allege some illegality and be sufficiently reliable. The tip in J.L. satisfied neither of the two requirements, and the tip in our case satisfies both.

- 18 -

United States Supreme Court did anyone assert that the tip in J.L. involved a complaint of brandishing.

In addition to alleging a specific illegality, the brandishing tip in our case has another characteristic that distinguishes it from J.L. Even if the J.L. tip had alleged a specific illegality (like, for example, if the tip had said the suspect had both a weapon and illegal drugs on him at that bus stop),[9] the illegality would have been concealed. In contrast, the tip in our case involved an open and obvious illegality. Anyone watching the suspect could have seen him brandishing the firearm. It matters not that the anonymous caller did not have predictive information about the suspect. He was simply reporting what he saw. The United States Supreme Court in White "did not create a rule requiring that a tip predict future action, and neither did J.L." Wheat, 278 F.3d at 734 (citation omitted). Nor do we. The consequences of such an inflexible rule would be unwise at best and dangerous at worse.

If we were to adopt such a rule, it would preclude a police officer from stopping a shooting suspect who is fleeing the scene of an alleged crime simply because the anonymous tip (reported by an alleged eyewitness providing a near-contemporaneous description of the suspect and the offense) did not recite any predictive information about the shooter. In

---

[9] Simultaneously possessing both a firearm and illegal drugs violates Code § 18.2-308.4(A).

such a case, what would matter to any reasonable officer (and, under the law, what should matter to any reasonable court) is whether the caller actually saw the shooter and the shooting, not whether the caller knows some intimate details of the shooter's personal life. To reject this commonsense distinction between a concealed crime (which may require some showing of predictive quality to the tip) and an open and obvious crime (which focuses only on observational reliability), as Jackson urges us to do, would hardly be in keeping with the rule of reason animating the Fourth Amendment.

An equally dispositive distinction between the J.L. tip and the tip in our case is that the brandishing tip in our case came from a caller making a contemporaneous report of observable events as an eyewitness. The tipster in J.L. did not state that he observed J.L. with the firearm. The fact is, the tip did not express or imply any first-person, present-tense observation of the reported facts. Like the officers in J.L., we are left to wonder whether the tipster saw anything himself or whether he simply made a wild (albeit accurate) guess that J.L. was carrying a gun.[10]

---

[10] We do not consider Harris v. Commonwealth, 262 Va. 407, 551 S.E.2d 606 (2001), to be inconsistent with our analysis. In that case, the Commonwealth stipulated that the anonymous tip (alleging a suspected drug dealer was "armed") was insufficient to justify a Terry stop, thus rendering the J.L. issue moot. Recognizing this, the Virginia Supreme Court stated: "Accordingly, we need not address that aspect of the Court of Appeals opinion." Harris, 262 Va. at 414, 551 S.E.2d at 609. From there, Harris went on to address only the question whether

Finally, we find the corroboration sufficient in light of the imminent danger to the public raised by the anonymous brandishing tip. In Scott, 20 Va. App. at 727, 460 S.E.2d at 611, an anonymous caller reported that he saw a man "brandishing a gun" in a laundromat. The caller gave a specific description of the man's appearance. The police found the man a block away and took a firearm from him during a pat-down search. We held that the "imminent danger" posed by a suspect brandishing a firearm in a public place warranted the stop because of the enormous risk that, if the tip were true, innocent lives might be placed in immediate peril. Scott, 20 Va. App. at 728-29, 460 S.E.2d at 612-13.

The same conclusion reached in Scott must be reached here, a case where police officers received information from a concerned citizen about a suspect brandishing a firearm outside

_____

the police officer had a reasonable suspicion that the suspect was trespassing. On that narrow issue, Harris held that the Commonwealth could not use a concededly invalid tip (concerning an "armed" drug dealer) to rehabilitate a Terry stop (based solely on a trespassing hunch) which itself lacked any reasonable suspicion of illegality. Nothing in the Virginia Supreme Court's opinion in Harris, therefore, deals with the question whether the tip did or did not satisfy the J.L. standard. Our panel decision, Harris v. Commonwealth, 33 Va. App. 325, 533 S.E.2d 18 (2000), which was reversed on other grounds, found the tip in violation of J.L. This finding, however, does not contradict our analysis. The tip in Harris did not provide a reasonable basis for an officer to conclude that the tipster was an eyewitness reporting contemporaneous events, or that the suspect's use of the weapon involved an open and obvious illegality, or that the conduct presented an imminent danger to public safety.

- 21 -

a bar at about 2:00 a.m.  For the police not to act in such circumstances, the trial judge correctly observed, would have been a dereliction of duty.  Whatever the appropriate level of Fourth Amendment scrutiny, it should not permit (much less encourage) a law enforcement officer "'to simply shrug his shoulders and allow a crime to occur or a criminal to escape.'" United States v. Montoya de Hernandez, 473 U.S. 531, 544 (1985) (quoting Williams, 407 U.S. at 145); see also Simmons v. Commonwealth, 217 Va. 552, 554, 231 S.E.2d 218, 220 (1977); Christian v. Commonwealth, 33 Va. App. 704, 713, 536 S.E.2d 477, 482 (2000) (en banc).

For the same reasons we find unpersuasive the analogy between J.L. and the present case, we find it equally unconvincing as a basis for overruling Scott.  Unlike Scott, the tip in J.L. did not involve a contemporaneous, eyewitness account, but rather a vague report providing absolutely no basis for the officers to discern the possible source of the caller's information or its timeliness.  Also unlike Scott, the tip in J.L. did not describe an open and obvious crime involving an imminent danger to public safety, but rather a concealed one (assuming any alleged illegality at all) implicating no immediate peril.

In sum, we find the brandishing tip in our case "reliable in its assertion of illegality," J.L., 529 U.S. at 272, because this tip — unlike the "carrying a gun" tip in J.L. — provided

- 22 -

information permitting the officers reasonably to infer that it (i) came from a concerned citizen making a contemporaneous, eyewitness report, (ii) involved an open and obvious crime rather than mere concealed illegality, and (iii) described criminality posing an imminent danger to the public. After corroborating a half-dozen specific details within minutes of the tip, the officers correctly concluded the totality of the circumstances raised a "reasonable suspicion to believe that criminal activity 'may be afoot.'" Arvizu, 534 U.S. at 273 (citations and quotation marks omitted).

In so holding, we find our views consistent with other appellate courts that have addressed specifically the distinguishing characteristics of the unreliable tip in J.L. See, e.g., Walshire, 634 N.W.2d at 627-28, 630 ("This case is different from J.L. in several respects, one of which is particularly important: the information provided here did not concern concealed criminal activity, but rather illegality open to public observation."); Williams, 623 N.W.2d at 114 ("Quite simply, in contrast to the tipster in Florida v. J.L., the tipster here has made plain that she is an eyewitness."); State v. Rutzinski, 623 N.W.2d 516, 526 (Wis. 2001) ("[U]nlike the caller in J.L., the informant in this case . . . was making personal observations of Rutzinski's contemporaneous actions."); Boyea, 765 A.2d at 868 (distinguishing the tip in J.L. from tips asserting contemporaneous, eyewitness reports of open and

- 23 -

obvious illegality); see also Wheat, 278 F.3d at 729-37

(surveying and concurring with cases that find J.L.

distinguishable from cases involving eyewitness tips alleging

contemporaneous and openly dangerous illegality).

D.

Even assuming the legality of the vehicle stop, Jackson

still contends that no additional grounds existed for his

warrantless search and detention.  "When a police encounter goes

beyond an investigatory detention," Jackson argues, it "becomes

a 'seizure' of the suspect" and "full probable cause is required

for the seizure, not a mere showing of articulable suspicion."

In making this argument, Jackson views being questioned, ordered

out of the vehicle (albeit at gunpoint), and frisked as an

arrest.  He also assumes that, under Fourth Amendment

principles, all seizures must be arrests for purposes of

triggering the probable cause requirement.  We find merit in

neither argument.

Investigatory detentions and arrests both involve Fourth

Amendment seizures.[11]  They are quite dissimilar, however, in

actual practice and in legal principle.  In an investigatory

detention, an officer seeks to determine whether a crime has

---

[11] The Fourth Amendment "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest."  Brown v. Texas, 443 U.S. 47, 50 (1979) (citations omitted); Wechsler v. Commonwealth, 20 Va. App. 162, 170, 455 S.E.2d 744, 748 (1995).

been, or is about to be, committed.  The suspect's freedom to leave is impaired, but only temporarily.  If the officer's suspicions do not ripen into probable cause, the suspect must be promptly released once the purpose for the stop has been fulfilled.  In contrast, an arrest is "'the initial stage of a criminal prosecution.'"  Hill, 264 Va. at 547, 570 S.E.2d at 808 (quoting Terry v. Ohio, 392 U.S. 1, 26 (1968)).  "After an arrest, a citizen's liberty is completely constrained, at a minimum, until a judicial officer has determined the issue of bail."  Id.  Thus, the "different consequences that attend an arrest and an investigative detention are manifest."  Id.

During an investigatory stop, the officer may conduct a pat-down search for his own safety if he has a reasonable belief that the person may be armed and dangerous.  See Ybarra v. Illinois, 444 U.S. 85, 93-94 (1979).  The officer need not be "absolutely certain that the person is armed."  Simmons, 217 Va. at 556, 231 S.E.2d at 221.  "If he reasonably believes that the individual might be armed, the search is warranted to protect himself or others who may be in danger."  Id. (emphasis added).

In assessing whether a suspect may be armed and dangerous, an officer may consider "characteristics of the area surrounding the stop, the time of the stop, the specific conduct of the suspect individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime."  Christian,

33 Va. App. at 714, 536 S.E.2d at 482 (footnote omitted).

Courts assess reasonableness from the perspective of a reasonable officer on the scene, making allowance for the necessity of split-second decisions.  See Graham v. Connor, 490 U.S. 386, 396-97 (1989).[12]

In Scott, we approved a pat-down search of a suspect who had reportedly brandished a firearm in a public place.  The report came from an anonymous source which identified only the suspect's appearance and location.  The weapons frisk was nonetheless "warranted for the officer's protection and the protection of the public" given the immediate and potentially deadly risk the suspect posed.  Scott, 20 Va. App. at 729-30, 460 S.E.2d at 613.

Here, a contemporaneous report by a concerned citizen said three black males in the white Honda had been disorderly and one of them had brandished a firearm.  When questioned directly about having a gun, Jackson conspicuously attempted to hide under his crossed arms a bulge that a trained officer immediately believed to be a weapon.  The officers, therefore,

_____

[12] Simply viewing a bulge, without any other indicia of dangerousness, does not permit the officer to conduct a weapons frisk.  See Stanley v. Commonwealth, 16 Va. App. 873, 877, 433 S.E.2d 512, 514-15 (1993).  But if other suspicious conduct exists, such as the suspect's attempt to conceal the bulge or similar circumstances suggesting danger, the officer may perform a weapons frisk.  See Troncoso v. Commonwealth, 12 Va. App. 942, 945, 407 S.E.2d 349, 350-51 (1991).

did not act unreasonably by suspecting the bulge "might be" a firearm.  Simmons, 217 Va. at 556, 231 S.E.2d at 221.

We also reject Jackson's argument that the investigatory detention and weapons frisk amounted to a full custodial arrest. To protect themselves during a valid Terry stop, police officers have a right to draw their weapons, to handcuff a suspect, or even to threaten to use force if the circumstances reasonably warrant it.  See generally Thomas v. Commonwealth, 16 Va. App. 851, 857, 434 S.E.2d 319, 323 (1993), aff'd en banc, 18 Va. App. 454, 444 S.E.2d 275 (1994).  A Terry stop involves "a police investigation 'at close range,' when the officer remains particularly vulnerable in part because a full custodial arrest has not been effected, and the officer must make 'a quick decision as to how to protect himself and others from possible danger.'"  Servis v. Commonwealth, 6 Va. App. 507, 519, 371 S.E.2d 156, 162 (1988) (quoting Michigan v. Long, 463 U.S. 1032, 1053 (1983)) (emphasis in original).  If a suspect is dangerous, "he is no less dangerous simply because he is not arrested." Id. (internal quotations and brackets omitted).

Coercive measures, therefore, do not "convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances."  Johnson v. Commonwealth, 20 Va. App. 49, 55, 455 S.E.2d 261, 264-65 (1995); see also Harris v. Commonwealth, 27 Va. App. 554, 566, 500 S.E.2d 257, 263 (1998).  Police officers exceed their authority under Terry

only when their methods go beyond that reasonably needed to "confirm or dispel" their suspicions. Hamlin, 33 Va. App. at 501-02, 534 S.E.2d at 366. Questions of scope, whether in terms of duration or the extent of coercion, must be referred back to the basic reasonableness standard. When "'evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.'" Washington, 29 Va. App. at 15, 509 S.E.2d at 517 (quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)).

In this case, the officers ordered Jackson out of the car to frisk him only after they came to the reasonable conclusion that he was hiding a weapon —— likely the very one that had been brandished earlier. The only way to confirm or dispel that suspicion was to conduct a limited weapons search. Given the circumstances they faced at that time of night, we find nothing unreasonable about the officers unholstering their weapons during the frisk and ordering Jackson out of the car. Thus, we reject Jackson's contention that the officers went beyond the boundaries of Terry during their detention and weapons frisk of Jackson.

Having found the weapon, the officers had probable cause to believe Jackson was the black male who had reportedly brandished a firearm outside the bar. By placing him under arrest at that time, the officers gained the corollary authority to conduct a search incident to that arrest. United States v. Robinson, 414

U.S. 218, 224 (1973) ("It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment.").  For these reasons, the trial court correctly refused to suppress either the weapon found during the pat down or the crack cocaine found during the search incident to arrest.

## III.

Neither the initial stop of the white Honda, the investigatory detention and weapons frisk of Jackson, nor the search incident to Jackson's arrest constitutes a violation of the Fourth Amendment's proscription against "unreasonable searches and seizures."  The trial court, therefore, did not err in denying Jackson's suppression motion.

Affirmed.

Benton, J., with whom Fitzpatrick, C.J., Elder and Annunziata, JJ., join, dissenting.

The United States Supreme Court's recent decision in Florida v. J.L., 529 U.S. 266 (2000), could not be clearer. Without a dissent, the Court "h[e]ld that an anonymous tip lacking indicia of reliability . . . does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm." Id. at 274.

Rarely are the facts of two cases as congruent as the facts in J.L. and this case. As in J.L., the officer in this case received information from his dispatcher concerning a report from an anonymous person. As in J.L., "[s]o far as the record reveals, there is no audio recording of the tip, and nothing is known about the informant." 529 U.S. at 268. As in J.L., the testimony indicates an anonymous informant said that a man brandished a firearm in a public place. See 529 U.S. at 268 (noting that an anonymous caller reported that a young man "was carrying a gun"). As in J.L., the testimony indicates the anonymous informant described the gender, race, and location of the accused, but did not explain "how he knew about the gun." 529 U.S. at 271. As in J.L., the officer did not see a gun before detaining the man. Finally, as in J.L., the circumstances surrounding the anonymous informant's tip were not sufficient to negate the substantial risk of fabrication.

The similarities between J.L. and this case extend beyond the basic facts. Indeed, the present case presents the same

- 30 -

Fourth Amendment concerns that troubled the Supreme Court.  As in J.L., the officers' suspicion that Jackson was unlawfully carrying a weapon arose solely from a call made from an unknown location by an unknown caller.  Thus, I believe the majority misreads the import of J.L. when concluding that the decision turned upon a finding that the informant had not relayed to the police information about criminal conduct.[13]  Answering "[t]he question . . . whether an anonymous tip that a person is carrying a gun, is without more, sufficient to justify a police officer's stop and frisk of that person," 529 U.S. at 268, the Supreme Court expressly relied upon its prior decisions and held that, "[u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, . . . 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'"  Id. at 270 (quoting Alabama v. White, 496 U.S. 325,

_____

[13] Significantly, the majority opinion recognizes that it is not a crime to possess a gun in Virginia.  No statute prohibits an adult who is not a felon from openly displaying a gun.  Moreover, Virginia decisions arguably suggest that the informant's tip in this case made no reliable assertion of illegality because the mere report that a person "brandished" a gun is not sufficient to allege the person has committed a criminal offense under Code § 18.2-282.  "The gravamen of the offense [under Code § 18.2-282] is the inducement of fear in another."  Kelsoe v. Commonwealth, 226 Va. 197, 199, 308 S.E.2d 104, 104 (1983).  See also Bailey v. Commonwealth, 5 Va. App. 331, 335 n.1, 362 S.E.2d 750, 751 n.1 (1987) (noting that Code § 18.2-282 is not implicated if a weapon is brandished and "there is no evidence that fear by the victim was intended or resulted").  Thus, "pointing or brandishing a firearm" is only one of two elements of the offense.  Kelsoe, 226 Va. at 198, 308 S.E.2d at 104.

- 31 -

329 (1990)).  Thus, on facts virtually identical to this case, the Court concluded the informant's tip was not proved to be reliable and held that the tip's allegation of an illegal possession of a gun did "not justify a stop and frisk."  J.L., 529 U.S. at 274.

If, as the majority opinion here suggests, the issue in J.L. concerned the failure of the informant's tip to convey evidence of criminal conduct, the resolution of that case would not have required any discussion about the informant's reliability.  In that circumstance, regardless of the informant's reliability, the officer would not have had a reasonable suspicion that criminal activity was occurring and would not have had a basis to detain J.L.  See Terry v. Ohio, 392 U.S. 1, 27 (1968) (holding that a police officer may not detain a person for investigative purposes based on "his inchoate and unparticularized suspicion or 'hunch'" that criminal activity may be occurring).  See also Brown v. Texas, 443 U.S. 47 (1979).  Significantly, the Supreme Court's decision in J.L. notes that "[a]part from the tip, the officers had no reason to suspect any of the three [men] of illegal conduct." 529 U.S. at 268 (emphasis added).  Therefore, the majority opinion's assertion that the tip in J.L. failed to convey information about criminal conduct is simply wrong.

Explaining further the deficiency in the proof of the reliability of the informant's tip, the Supreme Court noted the following:

> The tip in the instant case lacked the moderate indicia of reliability present in White and essential to the Court's decision in that case. . . . All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J. L. If White was a close case on the reliability of anonymous tips, this one surely falls on the other side of the line.

J.L., 529 U.S. at 271. Indeed, the Supreme Court engaged in an extended discussion of the anonymous informant's reliability in J.L. precisely because the tip disclosed criminal conduct and might have supported a detention if the informant was proved to be reliable. See Adams v. Williams, 407 U.S. 143, 146-47 (1972).

Although all nine justices joined the J.L. opinion, see 529 U.S. at 274 (Kennedy, J., and Rehnquist, C.J. concurring, and noting "I join in the opinion in all respects"), the concurring opinion also refutes the interpretation the majority opinion in this case gives to J.L. Specifically, the concurring opinion posits as follows:

> An anonymous telephone tip without more is different, however, for even if the officer's testimony about receipt of the tip is found credible, there is a second layer of inquiry respecting the reliability of the informant that cannot be pursued. If the telephone call is truly anonymous, the

> informant has not placed his credibility at risk and can lie with impunity. The reviewing court cannot judge the credibility of the informant and the risk of fabrication becomes unacceptable.
>
> On this record, then, the Court is correct in holding that the telephone tip did not justify the arresting officer's immediate stop and frisk of respondent. There was testimony that an anonymous tip came in by a telephone call and nothing more. The record does not show whether some notation or other documentation of the call was made either by a voice recording or tracing the call to a telephone number. The prosecution recounted just the tip itself and the later verification of the presence of the three young men in the circumstances the Court describes.

529 U.S. at 275.

In addition, the notion that the police could "infer that [the tip] . . . came from a concerned citizen making a contemporaneous, eyewitness report" merely because the tip alleges "an open and obvious crime" is precisely the type of analysis that J.L. rejects. Nothing about such a tip provides a basis upon which anyone might conclude that the anonymous informant was honest or provided reliable information or was an eyewitness to the events or, for that matter, was a "concerned citizen." See Corey v. Commonwealth, 8 Va. App. 281, 288, 381 S.E.2d 19, 22 (1989) (noting that "[w]here courts have found a citizen-informant credible, he or she has usually been described with some particularity, such as 'known by the affiant for many years,' . . . '[having] no known criminal record, a mature person, regularly employed, a college student in good standing

- 34 -

[who] demonstrated truthful demeanor,' . . . 'a mature person, regularly employed and absen[t] of any motivations to falsify,' . . . or a 'law-abiding citizen, a respected businessman in the community, and one who, in the past, had demonstrated a truthful demeanor'"). A plain reading of J.L. discloses that the Supreme Court, in a footnote, summarily disposed of the thesis advanced by the majority opinion in this case when the Court ruled that "[t]he mere fact that a tip, if true, would describe illegal activity does not mean that the police may make a Terry stop without meeting the reliability requirement." J.L., 529 U.S. at 273 n.*. As in J.L., the tip in the present case lacks indicia of reliability.

The majority in this case accepts the Commonwealth's suggestion to disregard J.L. and to rely on this Court's decision in Scott v. Commonwealth, 20 Va. App. 725, 460 S.E.2d 610 (1995), to create some type of exception for guns. I believe that decision is not supportable. First, Scott was, in my view, wrongly decided, see 20 Va. App. at 730-32, 460 S.E.2d at 613-14 (Benton, J., dissenting and noting that "[t]he record in [Scott] contains no basis upon which anyone could have determined that the invisible, unknown informant was reliable or had a basis to know anything other than the presence of the defendant, or someone similarly dressed, in the laundromat"). Second, Scott was decided in 1995, five years before its similar facts were presented to the Supreme Court in J.L.. Third, in

- 35 -

cases involving the application of constitutional principles, the Supremacy Clause, U.S. Const. Art. VI, cl.2, does not allow state court decisions to trump decisions of the United States Supreme Court. Reynoldsville Casket Co. v. Hyde, 514 U.S. 749, 750-51 (1995); Harper v. Virginia Dep't of Taxation, 509 U.S. 86, 100 (1993); Kessler v. Department of Public Safety, 369 U.S. 153, 172 (1962).

I would also note that the Commonwealth pursued, and the Supreme Court of Virginia rejected, an argument similar to that advanced in this case. See Harris v. Commonwealth, 262 Va. 407, 551 S.E.2d 606 (2001). There, as here, "the Commonwealth does not expressly concede the applicability of the holding in J.L. to the facts of this case." Id. at 414, 551 S.E.2d at 609. There, as here, the Commonwealth argued that the anonymous informant's tip about a gun provided a heightened justification to support a detention. Id. at 416, 551 S.E.2d at 611. Rejecting this Court's decision that the officer could use the tip as a basis for conducting a frisk for the officer's safety, see Harris v. Commonwealth, 33 Va. App. 325, 334, 533 S.E.2d 18, 22 (2000), the Supreme Court reversed the conviction. The Court noted that the officer's detention of Harris was contrary to the ruling in J.L. and rejected the Commonwealth's argument as one that "bootstraps the legitimate concern for law enforcement officers' safety, which permits a protective search of a legally

detained suspect, to serve as the basis for detaining the suspect."  Harris, 262 Va. at 416, 547 S.E.2d at 611.

The United States Supreme Court has specifically rejected the type of firearm exception that the Commonwealth argued in Harris, and now in this case, and that the majority opinion resurrects from Scott.  The Court unambiguously held as follows:

> [A]n automatic firearm exception to our established reliability analysis would rove too far.  Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun. . . . If police officers may properly conduct Terry frisks on the basis of bare-boned tips about guns, it would be reasonable to maintain under the above-cited decisions that the police should similarly have discretion to frisk based on bare-boned tips about narcotics.  As we clarified when we made indicia of reliability critical in Adams and White, the Fourth Amendment is not so easily satisfied.

J.L., 529 U.S. at 272-73 (citations omitted).  These principles are equally applicable to a circumstance in which an anonymous informant says he observed the commission of an "open and obvious illegality."  Even in that circumstance, "[i]f the telephone call is truly anonymous, the informant has not placed his credibility at risk and can lie with impunity."  Id. at 275 (Kennedy, J., and Rehnquist, C.J., concurring).  In the absence of a "verifiable explanation of how the informant came to know of the information in the tip," Ramey v. Commonwealth, 35 Va. App. 624, 631, 547 S.E.2d 519, 523 (2001), there still

- 37 -

remains "a second layer of inquiry respecting the reliability of the informant that cannot be pursued." J.L., 529 U.S. at 275 (Kennedy, J., and Rehnquist, C.J., concurring).

The Commonwealth's reliance on cases from other jurisdictions to support its notion that the tip was reliable is equally unpersuasive. First, the informants in the two Wisconsin cases, State v. Williams, 623 N.W.2d 106 (Wis. 2001), and State v. Rutzinski, 623 N.W.2d 516, 526 (Wis. 2001), were not anonymous and were eyewitnesses. "[I]n stark contrast to Florida v. J.L., where nothing was known about the informant[,] . . . the informant [in Williams] identified her location . . . [as] 4261 North Teutonia." 623 N.W.2d at 114. Indeed, the Supreme Court of Wisconsin noted that the informant "more than merely identif[ied] her location, she repeatedly identified it as her home: 'my house,' 'my apartment building,' 'our apartment.' She also described the immediate surroundings: the alley, the parking lot on the side of her apartment building." Id. Hence, the court concluded that "[e]ven though the caller did not identify herself, she did provide self-identifying information, that is, her address," id., and she "made plain [by words and conduct] that she is an eyewitness." Id. The court further noted that "[a]lthough the caller said that she did not 'want to get involved,' by providing self-identifying information, she risked that her identity would be discovered. Consequently, the 9-1-1 caller put her anonymity at risk." Id.

For these reasons, the court agreed with the concurrence in J.L. that if "an informant places his [or her] anonymity at risk, a court can consider this factor in weighing the reliability of the tip."  Williams, 623 N.W.2d at 114.

Similarly, the Supreme Court of Wisconsin held that the informant in Ruzinski "exposed him or herself to being identified" by "indicat[ing] to the police prior to the stop that he or she was in the vehicle in front of [the accused's] pickup."  623 N.W.2d at 525.  Based upon the informant's call to the dispatcher, the investigating officer waited in the informant's direction of travel and saw both vehicles pass his location.  Id. at 519.  The court concluded that because "the informant understood that the police could discover his or her identity by tracing the . . . license plates or directing the vehicle to the side of the road . . . [and the informant] knew that he or she potentially could be arrested if the tip proved to be fabricated . . . , this threat of arrest could lead a reasonable police officer to conclude that the informant is being truthful."  Id. at 525-26.  Furthermore, the record in Ruzinski established that the informant stopped when the officer stopped the accused, and the informant spoke with the officer's supervisor.  Id. at 519.  In addition, the record in Ruzinski makes abundantly clear the informant was an eyewitness to the events.

In the present case, unlike the Wisconsin cases, the informant did not reveal his or her location or give information likely to disclose his identity. Thus, without the risk of potential arrest, the informant provided a tip precisely like the tip in J.L. -- patently unreliable.

Second, as in Ruzinski, the courts in the three other jurisdictions the Commonwealth relies upon ruled that "in contrast to the report of an individual in possession of a gun, an anonymous report of an erratic or drunk driver on the highway presents a qualitatively different level of danger, and concomitantly greater urgency for prompt action." State v. Boyea, 765 A.2d 862, 867 (Vt. 2000). See also United States v. Wheat, 278 F.3d 722, 729 (8th Cir. 2001) (same); State v. Walshire, 634 N.W.2d 625, 629 (Iowa 2001) (same). Thus, these cases present an issue of suspicion of drunken driving, which is not present in the case before us. In particular, Wheat identified the "qualitative" difference between reports of erratic driving and reports of gun possession as the opportunity for the police to "quietly observe the suspect 'for a reasonable period of time without running the risk of death or injury with every passing moment.'" 278 F.3d at 729-30 (citation omitted). See also Boyea, 765 A.2d at 864 n.2. Even assuming the validity of a distinction for anonymous reports of "drunk driving," that circumstance is absent in the present case. Indeed, this absence of imminent danger in cases involving firearms is the

precise reason the Supreme Court in J.L. refused to carve out a firearm exception.  See 529 U.S. at 274.  Cf. Boyea, 765 A.2d at 867 (holding that "a drunk driver[, contrary to someone possessing a gun,] is not at all unlike a 'bomb'").  The Supreme Court of Vermont, therefore, was careful to recognize in the following passage that the United States Supreme Court left no room to quibble about the lack of a gun exception:

> While acknowledging that guns are dangerous, the [United States Supreme] Court analogized the situation to one involving an anonymous tip concerning possession of narcotics.  In either case the contraband could pose a potential public risk, but in neither is the danger particularly imminent.  Thus, the Court rejected a rule that would have dispensed with the requirement of reliability "whenever and however" the information involved a gun.  J.L., [529 U.S. at 274].  At the same time, however, the Court carefully limited its holding to the facts, declining to "speculate" about situations involving other types of dangers, such as a report of a person carrying a bomb.  Id.

Boyea, 765 A.2d at 867.

In summary, I would hold that the United States Supreme Court has unanimously rejected the Commonwealth's hypothesis that there exists an "imminent danger" exception for firearms, and the Court "demand[s]" an "indicia of reliability . . . for a report of a person carrying a firearm."  J.L., 529 U.S. at 274 (emphasis added).  Because this case is clearly controlled by the Supreme Court's decision in J.L., I would reverse the conviction.  Therefore, I dissent.

Tuesday        11th

March, 2003.


Jerald Lorenzo Jackson,                                    Appellant,

 against       Record No. 3238-01-1
               Circuit Court No. 47010-01

Commonwealth of Virginia,                                  Appellee.


Upon a Petition for Rehearing En Banc

Before the Full Court


On February 19, 2003 came the appellant, by court-appointed counsel, and filed a petition praying that the Court set aside the judgment rendered herein on February 4, 2003, and grant a rehearing en banc thereof.

On consideration whereof, the petition for rehearing en banc is granted, the mandate entered herein on February 4, 2003 is stayed pending the decision of the Court en banc, and the appeal is reinstated on the docket of this Court.

The parties shall file briefs in compliance with Rule 5A:35. The appellant shall attach as an addendum to the opening brief upon rehearing en banc a copy of the opinion previously rendered by the Court in this matter. It is further ordered that

- 42 -

the appellant shall file with the clerk of this Court twelve additional copies of the appendix previously filed in this case.

                    A Copy,

                        Teste:

                                Cynthia L. McCoy, Clerk

                        By:

                                Deputy Clerk


- 43 -

Present: Judges Benton, Frank and Kelsey
Argued at Chesapeake, Virginia


JERALD LORENZO JACKSON

                                              OPINION BY
v.        Record No. 3238-01-1     JUDGE D. ARTHUR KELSEY
                                          FEBRUARY 4, 2003

COMMONWEALTH OF VIRGINIA


        FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
                    Randolph T. West, Judge

        Mark L. Williams for appellant.

        Susan M. Harris, Assistant Attorney General
        (Jerry W. Kilgore, Attorney General, on brief),
        for appellee.


    The trial court found the appellant, Jerald Lorenzo

Jackson, guilty of possession of cocaine (Code § 18.2-250),

possession of a concealed weapon (Code § 18.2-308), and

possession of a firearm while simultaneously possessing illegal

drugs (Code § 18.2-308.4(A)).  On appeal, Jackson challenges

only the trial court's denial of his pretrial suppression

motion.  We affirm the trial court on this issue, finding no

error in either its analysis or conclusion.

                            I.

    On appeal from a denial of a suppression motion, we must

review the evidence in the light most favorable to the

Commonwealth, giving it the benefit of any reasonable

inferences.  <u>Bass v. Commonwealth</u>, 259 Va. 470, 475, 525 S.E.2d

921, 924 (2000); Sabo v. Commonwealth, 38 Va. App. 63, 69, 561 S.E.2d 761, 764 (2002).

At 2:10 a.m. on June 17, 2001, the Newport News Police Department dispatched Officer M.A. Cook to a street corner next to a "small bar" to investigate an anonymous complaint. The caller reported (and the dispatcher advised the responding officers) that "three black males" were acting disorderly and "at least one of them had a firearm and was brandishing it." The caller also stated that the three "were getting into a car and leaving." The caller described the vehicle as a "white Honda." Sending backup, the police interpreted the report as "a high risk situation with a gun possibly involved."

Three to five minutes later, Cook and other officers arrived at the scene and observed a white Honda leaving the area. They saw no other white vehicles of any type. The white Honda "pulled out right in front" of Cook, permitting the headlights of his police cruiser to shine directly into the vehicle. Cook clearly saw three black males in the white Honda. On the basis of the brandishing tip, the officers followed the vehicle and stopped it several blocks away.

Cook approached the car and explained the reason for the stop. Sergeant James Hogan went to the passenger side of the vehicle and shined a light into the car. Jackson sat in the front passenger seat with his arms folded across his stomach. Hogan noted an unusual bulge underneath Jackson's shirt, which

- 45 -

the officer suspected to be a firearm. The bulge, Hogan concluded, "obviously was not part of his body" and was "too big" to be anything other than a handgun.

Hogan asked Jackson if he had a gun on him. Jackson said no. Hogan then said, "Could you pull your shirt up so that I can be comfortable with us talking, because I believe you have a firearm?" In response, Jackson pulled his shirt "a couple inches and put it back" and then "crossed his arms back across his stomach."

Fearing for his safety, Hogan unholstered his sidearm and ordered Jackson out of the car. After Jackson got out of the vehicle, Officer B.D. Bartley immediately conducted a weapons search and removed a Glock, .40 caliber, semiautomatic handgun from Jackson in the exact area of the previously noticed bulge. The officers then handcuffed Jackson and placed him under arrest. In a search incident to his arrest, the officers also found crack cocaine in Jackson's pants pocket.

## II.

At trial, Jackson moved to suppress the evidence, claiming that the police officers (i) lacked a sufficient basis to stop the white Honda and to question its occupants, and (ii) had equally insubstantial grounds for searching him for weapons or drugs. Both events, Jackson contended, violated search and

seizure principles protected by Virginia law and the United States Constitution.[14]

The trial court denied the motion, stating that the officers had "an obligation to protect the citizens of this community" and would have been "derelict in their duty" had they not acted as they did.  The procedures they followed, the trial judge concluded, were "strictly by the book."  For the following reasons, we agree with the trial court and affirm its decision.

## A.

Though the ultimate question whether the officers violated the Fourth Amendment triggers de novo scrutiny, we defer to the trial court's findings of "historical fact" and give "due weight to the inferences drawn from those facts by resident judges and local law enforcement officers."  Davis v. Commonwealth, 37 Va. App. 421, 429, 559 S.E.2d 374, 378 (2002) (citing Neal v. Commonwealth, 27 Va. App. 233, 237, 498 S.E.2d 422, 424 (1998)). Viewing the case through this evidentiary prism, we examine the

---

[14] See generally Code § 19.2-60 ("A person aggrieved by an allegedly unlawful search or seizure may move the court . . . to suppress it for use as evidence.").  To the extent Jackson invokes constitutional guarantees arising under Article I, § 10 of the Virginia Constitution, the state law analysis tracks the federal law interpreting the Fourth Amendment of the United States Constitution.  See Henry v. Commonwealth, 32 Va. App. 547, 551, 529 S.E.2d 796, 798 (2000).  "Our courts have consistently held that the protections afforded under the Virginia Constitution are co-extensive with those in the United States Constitution."  Sabo, 38 Va. App. at 77, 561 S.E.2d at 768 (citation omitted); see also Bennefield v. Commonwealth, 21 Va. App. 729, 739-40, 467 S.E.2d 306, 311 (1996).

trial court's factual findings to determine if they are plainly wrong or devoid of supporting evidence. See Mier v. Commonwealth, 12 Va. App. 827, 828, 407 S.E.2d 342, 343 (1991). The appellant must shoulder the "burden" of showing that the trial court's decision "constituted reversible error." McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (en banc) (citations omitted); see also Davis, 37 Va. App. at 429-30, 559 S.E.2d at 378.

B.

The Fourth Amendment "does not proscribe all seizures, only those that are 'unreasonable.'" Hodnett v. Commonwealth, 32 Va. App. 684, 690, 530 S.E.2d 433, 436 (2000) (quoting Welshman v. Commonwealth, 28 Va. App. 20, 30, 502 S.E.2d 122, 126-27 (1998) (en banc)); Hamlin v. Commonwealth, 33 Va. App. 494, 499, 534 S.E.2d 363, 365 (2000) (citation omitted). The Constitution simply "does not proscribe reasonable searches and seizures." Murphy v. Commonwealth, 37 Va. App. 556, 564, 559 S.E.2d 890, 893 (2002). The text of the Fourth Amendment draws the line there; so too must the courts.

In this context, reasonableness depends on the extent of the individual's loss of freedom caused by the seizure and the objective reason for it. A full custodial arrest requires a showing of probable cause. When police officers merely stop an automobile, however, they need only have a reasonable, articulable suspicion that the driver is unlicensed, the

- 48 -

automobile unregistered, or the "person stopped may be involved in criminal activity."  Bass, 259 Va. at 474-75, 525 S.E.2d at 923-24 (citations omitted).[15]  Actual proof that "criminal activity is afoot is not necessary," only that it "may be afoot."  Harmon v. Commonwealth, 15 Va. App. 440, 444, 425 S.E.2d 77, 79 (1992); see also United States v. Arvizu, 534 U.S. 266, 273 (2002); Hamlin, 33 Va. App. at 501, 534 S.E.2d at 366. Though an officer's reliance on a mere hunch cannot justify a stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Arvizu, 534 U.S. at 274.[16]

---

[15] When police officers "'stop a motor vehicle and detain an occupant, this constitutes a seizure of the person for Fourth Amendment purposes.'"  Logan v. Commonwealth, 19 Va. App. 437, 441, 452 S.E.2d 364, 367 (1994) (quoting Zimmerman v. Commonwealth, 234 Va. 609, 611, 363 S.E.2d 708, 709 (1988)). After making a lawful stop of a vehicle and questioning its occupants, an officer may order a passenger out of the vehicle. See Maryland v. Wilson, 519 U.S. 408, 415 (1997); Harris v. Commonwealth, 27 Va. App. 554, 561-63, 500 S.E.2d 257, 260-61 (1998); Welshman, 28 Va. App. at 31-33, 502 S.E.2d at 127-28; Hatcher v. Commonwealth, 14 Va. App. 487, 491-92, 419 S.E.2d 256, 258-59 (1992).

[16] See also Parker v. Commonwealth, 255 Va. 96, 104, 496 S.E.2d 47, 51-52 (1998) (an investigatory detention may take place "even though there is no probable cause to make an arrest" (citing Terry v. Ohio, 392 U.S. 1, 22 (1968))); Clarke v. Commonwealth, 32 Va. App. 286, 295, 527 S.E.2d 484, 488 (2000) (the test for reasonable suspicion is "less stringent than the test for probable cause").

Under equally settled principles, "anonymous information that has been sufficiently corroborated may furnish reasonable suspicion justifying an investigative stop." Bulatko v. Commonwealth, 16 Va. App. 135, 137, 428 S.E.2d 306, 307 (1993) (citing Alabama v. White, 496 U.S. 325, 331 (1990)). "An informant's tip can provide the justification for a Terry stop even if the informant's reliability is unknown and certainly can do so if, as here, the information is corroborated." Washington v. Commonwealth, 29 Va. App. 5, 11, 509 S.E.2d 512, 515 (1999) (en banc) (citation omitted). "Anonymous information sufficiently corroborated may give reasonable suspicion for an investigative stop although the unverified tip by itself would not justify a forcible stop." Washington, 29 Va. App. at 12, 509 S.E.2d at 515.

Described as "the classic case on the value of corroborative efforts of police officials," Illinois v. Gates, 462 U.S. 213, 242 (1983), the United States Supreme Court decision in Draper v. United States, 358 U.S. 307 (1959), involved a known informant who reported that the suspect would be arriving on a particular train, wearing certain kinds of clothes, carrying particular pieces of luggage, would walk briskly, and "would be carrying a quantity of heroin." Gates, 462 U.S. at 242. The informant "gave no indication of the basis for his information." Id. The police verified all of these details except the allegation that the suspect had "heroin on

his person or in his bag."  Gates, 462 U.S. at 243.  By itself,
however, this omission did not invalidate the reliability of the
tip.  As the Supreme Court explained,

> with every other bit of [the informant's]
> information being thus personally verified,
> [the officer] had "reasonable grounds" to
> believe that the remaining unverified bit of
> [the informant's] information — that [the
> suspect] would have the heroin with him —
> was likewise true.

Id. (quoting Draper, 358 U.S. at 313); see also Boyd v.
Commonwealth, 12 Va. App. 179, 189, 402 S.E.2d 914, 920 (1991)
("The verification of the personal information becomes, then,
but another circumstance the [officer] may consider in
determining whether the informer is to be believed.  It is a
factor which reduced the chances that [the informer's report
was] a reckless or prevaricating tale."  (citing Gates, 462 U.S.
at 244-45) (internal quotations omitted)).

The Fourth Amendment has never required that the same
inflexible rule of reliability be applied to all cases involving
informants.  "Rigid legal rules are ill-suited to an area of
such diversity.  'One simple rule will not cover every
situation.'"  Gates, 462 U.S. at 232 (quoting Adams v. Williams,
407 U.S. 143, 147 (1972)).  Even the reasonable suspicion
standard itself, a "somewhat abstract" and "'elusive concept,'"
cannot be reduced to a "'"neat set of legal rules."'"  Arvizu,
534 U.S. at 274 (quoting Ornelas v. United States, 517 U.S. 690,
695-96 (1996), and Gates, 462 U.S. at 232 (additional citation

omitted)).  Given the flexibility inherent in the concept of reasonableness, the level of corroboration required by the Fourth Amendment depends on commonsense principles.  In this case, three such principles stand out.

First, citizens who witness a crime in progress are presumed personally reliable, and thus, courts do not "not apply to citizen informers the same standard of reliability as is applicable when police act on tips from professional informers or those who seek immunity for themselves . . . ."  Guzewicz v. Commonwealth, 212 Va. 730, 735-36, 187 S.E.2d 144, 148 (1972).  Information from a "disinterested citizen" who claims to be an eyewitness of a crime may be given more weight than "information from a 'criminal' informer, whose motives are less likely to be pure."  Reed v. Commonwealth, 36 Va. App. 260, 267-68, 549 S.E.2d 616, 619-20 (2001); see also McCreary v. Sigler, 406 F.2d 1264, 1269 (8th Cir. 1969) ("Probable cause for an arrest may exist where an unknown citizen makes complaints, as a victim or eyewitness to a crime, where the underlying circumstances demonstrate his first-hand personal knowledge.").

Put another way, a call from a concerned citizen who witnesses a crime requires not so much "personal reliability" of the observer, but "observational reliability" of his observations.  State v. Walshire, 634 N.W.2d 625, 629 (Iowa 2001); see also State v. Williams, 623 N.W.2d 106, 115 (Wis.), cert. denied, 122 S. Ct. 343 (2001).  Observational reliability

exists where the police can corroborate significant details, the corroboration takes place soon after the alleged observation, and the eyewitness report is something that could have been seen had it happened as described.[17]  As we said in Beckner v. Commonwealth, 15 Va. App. 533, 537, 425 S.E.2d 530, 533 (1993), albeit in dicta, an anonymous report that a suspect is "displaying a gun" implies a "personal basis of knowledge" upon which reasonable officers may rely.

Second, the Fourth Amendment requirement of corroboration also takes into account whether the alleged illegality involves a concealed crime or an open and obvious crime.  It matters a great deal if the illegality alleged in the tip "'did not involve a concealed crime — a possessory offense.'"  United States v. Wheat, 278 F.3d 722, 734 (8th Cir. 2001) (quoting State v. Boyea, 765 A.2d 862, 875 (Vt. 2000) (Skoglund, J., concurring)), cert. denied, 123 S. Ct. 194 (2002).  If what was "described in the police dispatch to the arresting officer was a crime in progress, carried out in public, identifiable and observable by anyone," the anonymous tip may not need the same

---

[17] See, e.g., Gregory v. Commonwealth, 22 Va. App. 100, 107, 468 S.E.2d 117, 121 (1996) ("Accordingly, a detailed description, like that given here, by a caller who appears to have been a concerned citizen who recently observed a person hailing motorists to sell drugs, together with immediate verification of aspects of the description are important factors to consider in determining whether the officer had reasonable suspicion, even when the description contains facts that are 'easily obtained.'").

species of corroboration required for reports of concealed crimes. Id.

In other words, what may be reasonable corroboration for tips alleging an open and obvious crime (particularly from a caller claiming to be an eyewitness) may be unsatisfactory for those asserting a concealed crime. For concealed crimes, the tip may need some insider information capable of predicting the suspect's actions. This conclusion stems from the truism, noted in White, 496 U.S. at 332, that when a tipster has knowledge of information about the suspect which the "general public would have no way of knowing," then it can be reasonably inferred that the tipster "is likely to also have access to reliable information about that individual's illegal activities." In such cases, the tip becomes more reliable to the extent it reveals "inside information" demonstrating a "special familiarity" with the suspect's affairs. Id.

When an anonymous caller reports an open and obvious crime (like when a suspect brandishes a weapon or, for that matter, shoots someone), the Fourth Amendment may require no showing that the caller have inside information about the suspect capable of predicting his future conduct.[18] A "careful reading" of the United States Supreme Court's cases shows that the

_____

[18] We made a similar point in response to an appellant who argued that White established an inflexible rule that "information supplied to the government by an unidentified informant may not establish reasonable suspicion to effect an

- 54 -

"emphasis on the predictive aspects of an anonymous tip may be less applicable to tips purporting to describe contemporaneous, readily observable criminal actions . . . ." Wheat, 278 F.3d at 734. In such cases, the duty to corroborate focuses mainly on whether the tipster has accurately identified the suspect and described the illegality. "Almost always, it comes from his eyewitness observations, and there is no need to verify that he possesses inside information." Id.

Third, the reasonable corroboration standard also takes into account the seriousness of the danger posed by the alleged illegality. On several occasions "we have recognized a line of cases where courts have found reasonable suspicion for an investigatory stop when the public is in imminent danger, despite the fact that the stop is based on information provided by an anonymous informant who has not provided any basis of knowledge." Scott v. Commonwealth, 20 Va. App. 725, 728, 460 S.E.2d 610, 612 (1995) (citations omitted); see also Ramey v. Commonwealth, 35 Va. App. 624, 633, 547 S.E.2d 519, 524 (2001) ("We have applied an imminent danger standard in reviewing the sufficiency of an anonymous tip where there is a contemporaneous

investigative stop, unless the information predicts the future actions of the individual stopped." Beckner, 15 Va. App. at 535, 425 S.E.2d at 531. Our response was unequivocal: "We disagree with the appellant on this point. We believe that a finding of reasonable suspicion may be warranted in some circumstances, despite the unidentified informant not providing the government with information that predicts the future actions of the subject, if some other indicia of reliability of the informant exists." Id.

description of dangerous criminal activity such as brandishing a firearm in a public place."). In such cases, the "imminent public danger" may provide ample justification for an "immediate investigation." Beckner, 15 Va. App. at 538, 425 S.E.2d at 534; cf. Giles v. Commonwealth, 32 Va. App. 519, 524-25, 529 S.E.2d 327, 330 (2000) (considering the "imminence of serious and perhaps lethal danger" as a factor in Terry stop analysis).

C.

In light of these principles, we reject Jackson's argument that the police had no authority to stop the white Honda and to question its occupants. The officers received a dispatch stating that three black males in a white Honda had been observed acting disorderly and one had been seen "brandishing" a firearm. On its face, the report alleged open and obvious criminal behavior. Brandishing a firearm means using it "in such manner as to reasonably induce fear in the mind of another or holding a firearm in a public place in such a manner as to reasonably induce fear in the mind of another of being shot or injured." Code § 18.2-282(A). The ordinary meaning of the word tracks its statutory definition. Brandishing a firearm means to "wave, shake, or exhibit in a menacing, challenging, or exultant way." Webster's New World Dictionary 170 (3d college ed. 1988).

That leaves only one issue: Did the officers sufficiently corroborate the information in the call? The trial court correctly found that they did. The caller reported six

significant details:  the make of the vehicle (Honda), its color

(white), its location (leaving the bar), the number of the

occupants in the car (three), the race of each of the occupants

(black), and the gender of each of the occupants (males).

Having corroborated each of these details, within minutes of the

original report, the police had an objectively reasonable belief

that the remaining portion of the tip —— that one of the

suspects had brandished a firearm only moments before —— was

likewise true.  It is hardly unreasonable to believe that

"'because an informant is right about some things, he is more

probably right about other facts' . . . including the claim

regarding the [the suspect's] illegal activity."  Gates, 462

U.S. at 244 (quoting Spinelli v. United States, 393 U.S. 410,

427 (1969) (White, J., concurring)).

Although the information came from a concerned citizen

making an anonymous call to the police, this fact strengthens,

not weakens, the reliability of the tip.  No information

suggests the unknown caller was a paid informant or a known

criminal tipster.  More important, the caller claimed he

observed one of the disorderly suspects "brandishing" the weapon

and then "getting into a car and leaving."  The caller described

the events in the first person, reporting his personal

observations about events then occurring.  The tip in our case,

moreover, involved an open and obvious illegality.  By

definition, brandishing must be visible.  Thus, anyone outside

the bar (or inside the bar looking out the window) could have seen it.[19]

Jackson's argument to the contrary fails to calibrate his disagreement at the relevant level of persuasion. For a mere investigatory detention, the Fourth Amendment does not require a showing that the suspicion of illegality be more likely true than not. Arvizu, 534 U.S. at 273-74. Nor, for that matter, need there be even the lesser showing that probable cause exists for such a belief. Id. There simply must be a reasonable suspicion, not one based on a mere guess or instinctual hunch. The sufficiency of the corroboration, therefore, need only be great enough to elevate the suspicion from an unfounded supposition to a reasonable one.

Jackson contends our reasoning has been undermined by Florida v. J.L., 529 U.S. 266 (2000). We disagree. The only "question presented" in that case ⸺ according to the United States Supreme Court ⸺ was "whether an anonymous tip that a

_____

[19] For these reasons, we do not see any favorable comparison between this case and Ramey, 35 Va. App. at 627, 547 S.E.2d at 521, where the anonymous tip did not involve either a contemporaneous or an eyewitness report. Instead, the tip in Ramey simply stated that a "black male was 'somehow' involved in a fatal gang shooting the previous day, but relayed no further information as to the source of the report or in what capacity the black male was involved in the shooting." Id. We found this tip legally insufficient for fairly obvious reasons. An anonymous tip claiming a suspect had "somehow" committed a crime "the previous day," however, is quite different from an eyewitness report that a suspect is committing a crime at that very moment ⸺ particularly when the police provide near

- 58 -

person is carrying a gun is, <u>without</u> <u>more</u>, sufficient to justify a police officer's stop and frisk of that person." <u>Id.</u> at 268 (emphasis added); <u>see</u> <u>also</u> <u>Commonwealth v. Hill</u>, 264 Va. 541, 545, 570 S.E.2d 805, 807 (2002). The anonymous call reported only "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." <u>J.L.</u>, 529 U.S. at 268. As J.L. correctly put it, the "tipster did not even allege that a crime was being committed." Brief of Respondent, <u>Florida v. J.L.</u>, 1998 U.S. Briefs LEXIS 1993 at *4 (Jan. 25, 2000).

In other words, the tip in <u>J.L.</u> did not contain "a specific description of dangerous criminal conduct either under way or likely to occur." <u>Ramey</u>*,* 35 Va. App. at 633, 547 S.E.2d at 524 (describing the deficiency in the <u>J.L.</u> tip). Reasonable suspicion "requires that a tip be reliable in its assertion of illegality," not just in its ability to identify a particular suspect. <u>Hill</u>, 264 Va. at 545, 570 S.E.2d at 807 (quoting <u>J.L.</u>, 529 U.S. at 272). The holding of <u>J.L.</u> turns on this very point:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has <u>knowledge of concealed criminal activity</u>. The reasonable suspicion here at issue requires that a tip be reliable in its

---

immediate corroboration of a half-dozen observational details contained in the report.

> assertion of illegality, not just in its
> tendency to identify a determinate person.

J.L., 529 U.S. at 272 (emphasis added).  J.L. cited with

approval a leading text that distinguishes "reliability as to

identification, which is often important in other criminal law

contexts, from reliability as to the likelihood of criminal

activity, which is central in anonymous-tip cases."  Id.

(summarizing 4 W. LaFave, Search and Seizure § 9.4(h), at 213

(3d ed. 1996)).

This fact alone distinguishes J.L. from our case.  Absent

some disqualifying status (being a felon, juvenile, or drug

possessor) or situs (being in a place where weapons are

forbidden), it is not a crime to possess a weapon.  The tipster

in J.L., therefore, made no reliable assertion of illegality.[20]

On the other hand, no matter one's status or situs, it is a

crime to brandish a firearm in a public place.  And that is

_____

[20] The officers in J.L. did not discover the illegality of
J.L. "carrying a gun" until after they detained J.L. and
determined he was a juvenile and, in any event, did not possess
a concealed weapon permit.

> That the allegation about the gun turned out
> to be correct does not suggest that the
> officers, prior to the frisks, had a
> reasonable basis for suspecting J.L. of
> engaging in unlawful conduct:  The
> reasonableness of official suspicion must be
>
> measured by what the officers knew before
> they conducted their search.

J.L., 529 U.S. at 271.

- 60 -

exactly what the tipster in our case asserted in a contemporaneous, eyewitness report.  We thus see a substantial difference between the tip in J.L. (a man is carrying a gun) and the tip in our case (a man is pointing a gun at people).[21]

The "carrying a gun" shorthand expression in J.L., moreover, should not be mistakenly interpreted as "brandishing" a gun.  The Florida Supreme Court, affirmed by the United States Supreme Court, made clear that the officers "received an anonymous tip that a young man was carrying a concealed weapon." J.L. v. Florida, 727 So. 2d 204, 207 (Fla. 1998) (emphasis added).  The Florida Court of Appeals also confirmed that the "police received an anonymous complaint that a concealed weapon violation was taking place."  Florida v. J.L., 689 So. 2d 1116, 1117 (Fla. Dist. Ct. App. 1997) (emphasis added).  The United States Supreme Court granted certiorari on a single question presented, whether a tip alleging "a person is carrying a concealed firearm" passed the reliability test.  Brief of Petitioner, Florida v. J.L., 1998 U.S. Briefs LEXIS 1993 at *i

_____

[21]  The reason J.L. nevertheless engaged the reliability analysis was because reasonable suspicion, under the totality of the circumstances test, requires that both "quantity and quality" factors be considered, allowing for the "requisite quantum" of one to affect necessarily the other.  White, 496 U.S. at 330.  A footnote in J.L. notes that the "mere fact that a tip, if true, would describe illegal activity does not mean that the police may make a Terry stop without meeting the reliability requirement."  J.L., 529 U.S. at 273 n.*.  This unremarkable proposition simply means that an anonymous tip must allege some illegality and be sufficiently reliable.  The tip in

- 61 -

(Dec. 23, 1999) (emphasis added).  Not one time in any of the judicial opinions or legal briefs accompanying J.L. to the United States Supreme Court did anyone assert that the tip in J.L. involved a complaint of brandishing.

In addition to alleging a specific illegality, the brandishing tip in our case has another characteristic that distinguishes it from J.L.  Even if the J.L. tip had alleged a specific illegality (like, for example, if the tip had said the suspect had both a weapon and illegal drugs on him at that bus stop),[22] the illegality would have been concealed.  In contrast, the tip in our case involved an open and obvious illegality.  Anyone watching the suspect could have seen him brandishing the firearm.  It matters not that the anonymous caller did not have predictive information about the suspect.  He was simply reporting what he saw.  The United States Supreme Court in White "did not create a rule requiring that a tip predict future action, and neither did J.L."  Wheat, 278 F.3d at 734 (citation omitted).  Nor do we.  The consequences of such an inflexible rule would be unwise at best and dangerous at worse.

If we were to adopt such a rule, it would preclude an officer from stopping a shooting suspect while fleeing the scene

---

J.L. satisfied neither of the two requirements, and the tip in our case satisfies both.

[22] Simultaneously possessing both a firearm and illegal drugs violates Code § 18.2-308.4(A).

of an alleged crime simply because the anonymous tip (reported by an alleged eyewitness providing a near-contemporaneous description of the suspect and the offense) did not recite any predictive information about the shooter.  In such a case, what would matter to any reasonable officer (and, under the law, what should matter to any reasonable court) is whether the caller actually saw the shooter and the shooting, not whether the caller knows some intimate details of the shooter's personal life.  To reject this commonsense distinction between a concealed crime (which may require some showing of predictive quality to the tip) and an open and obvious crime (which focuses only on observational reliability), as Jackson urges us to do, would hardly be in keeping with the rule of reason animating the Fourth Amendment.

An equally dispositive distinction between the J.L. tip and the tip in our case is that the brandishing tip in our case came from a caller making a contemporaneous report of observable events as an eyewitness.  The tipster in J.L. did not state that he observed J.L. with the firearm.  The fact is, the tip did not express or imply any first-person, present-tense observation of the reported facts.  Like the officers in J.L., we are left to wonder whether the tipster saw anything himself or whether he

simply made a wild (albeit accurate) guess that J.L. was carrying a gun.[23]

Finally, we find the corroboration sufficient in light of the imminent danger to the public raised by the anonymous brandishing tip.  In Scott, 20 Va. App. at 727, 460 S.E.2d at 611, an anonymous caller reported that he saw a man "brandishing a gun" in a laundromat.  The caller gave a specific description of the man's appearance.  The police found the man a block away and took a firearm from him during a pat-down search.  We held that the "imminent danger" posed by a suspect brandishing a firearm in a public place warranted the stop because of the enormous risk that, if the tip were true, innocent lives might be placed in immediate peril.  Scott, 20 Va. App. at 728-29, 460 S.E.2d at 612-13.

The same conclusion reached in Scott must be reached here, a case where police officers received information from a

_____

[23] We do not consider Harris v. Commonwealth, 262 Va. 407, 551 S.E.2d 606 (2001), to be at cross purposes with our analysis.  In that case, the Commonwealth stipulated that the anonymous tip (alleging a suspected drug dealer was "armed") was insufficient to justify a Terry stop, thus rendering the J.L. issue moot.  Recognizing this, the Virginia Supreme Court stated:  "Accordingly, we need not address that aspect of the Court of Appeals opinion."  Harris, 262 Va. at 414, 551 S.E.2d at 609.  From there, Harris went on to address only the question whether the police officer had a reasonable suspicion that the suspect was trespassing.  On that narrow issue, Harris held that the Commonwealth could not use a concededly invalid tip (concerning an "armed" drug dealer) to rehabilitate a Terry stop (based solely on a trespassing hunch) which itself lacked any reasonable suspicion of illegality.  Nothing in Harris,

concerned citizen about a suspect brandishing a firearm outside a bar at about 2:00 a.m.  For the police not to act in such circumstances, the trial judge correctly observed, would have been a dereliction of duty.  Whatever the appropriate level of Fourth Amendment scrutiny, it should not permit (much less encourage) a law enforcement officer "'to simply shrug his shoulders and allow a crime to occur or a criminal to escape.'" United States v. Montoya de Hernandez, 473 U.S. 531, 544 (1985) (quoting Williams, 407 U.S. at 145); see also Simmons v. Commonwealth, 217 Va. 552, 554, 231 S.E.2d 218, 220 (1977); Christian v. Commonwealth, 33 Va. App. 704, 713, 536 S.E.2d 477, 482 (2000) (en banc).

For the same reasons we find unpersuasive the analogy between J.L. and the present case, we find it equally unconvincing as a basis for overruling Scott.  Unlike Scott, the tip in J.L. did not involve a contemporaneous, eyewitness account, but rather a vague report providing absolutely no basis for the officers to discern the possible source of the caller's information or its timeliness.  Also unlike Scott, the tip in J.L. did not describe an open and obvious crime involving an imminent danger to public safety, but rather a concealed one (assuming any alleged illegality at all) implicating no immediate peril.

_____

therefore, deals with the question whether the tip did or did not satisfy the J.L. standard.

In sum, we find the brandishing tip in our case "reliable in its assertion of illegality," J.L., 529 U.S. at 272, because this tip —— unlike the "carrying a gun" tip in J.L. —— provided information permitting the officers reasonably to infer that it (i) came from a concerned citizen making a contemporaneous, eyewitness report, (ii) involved an open and obvious crime rather than mere concealed illegality, and (iii) described criminality posing an imminent danger to the public.  After corroborating a half-dozen specific details within minutes of the tip, the officers correctly concluded the totality of the circumstances raised a "reasonable suspicion to believe that criminal activity 'may be afoot.'"  Arvizu, 534 U.S. at 273 (citations and quotation marks omitted).

D.

Even assuming the legality of the vehicle stop, Jackson still contends that no additional grounds existed for his warrantless search and detention.  "When a police encounter goes beyond an investigatory detention," Jackson argues, it "becomes a 'seizure' of the suspect" and "full probable cause is required for the seizure, not a mere showing of articulable suspicion."  In making this argument, Jackson views being questioned, ordered out of the vehicle (albeit at gunpoint), and frisked as an arrest.  He also assumes that, under Fourth Amendment principles, all seizures must be arrests for purposes of

triggering the probable cause requirement.  We find merit in neither argument.

Investigatory detentions and arrests both involve Fourth Amendment seizures.[24]  They are quite dissimilar, however, in actual practice and in legal principle.  In an investigatory detention, an officer seeks to determine whether a crime has been, or is about to be, committed.  The suspect's freedom to leave is impaired, but only temporarily.  If the officer's suspicions do not ripen into probable cause, the suspect must be promptly released once the purpose for the stop has been fulfilled.  In contrast, an arrest is "'the initial stage of a criminal prosecution.'"  Hill, 264 Va. at 547, 570 S.E.2d at 808 (quoting Terry v. Ohio, 392 U.S. 1, 26 (1968)).  "After an arrest, a citizen's liberty is completely constrained, at a minimum, until a judicial officer has determined the issue of bail."  Id.  Thus, the "different consequences that attend an arrest and an investigative detention are manifest."  Id.

During an investigatory stop, the officer may conduct a pat-down search for his own safety if he has a reasonable belief that the person may be armed and dangerous.  See Ybarra v. Illinois, 444 U.S. 85, 93-94 (1979).  The officer need not be "absolutely certain that the person is armed."  Simmons, 217 Va.

_____

[24] The Fourth Amendment "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest."  Brown v. Texas, 443 U.S. 47, 50

- 67 -

at 556, 231 S.E.2d at 221.  "If he reasonably believes that the individual might be armed, the search is warranted to protect himself or others who may be in danger."  Id. (emphasis added).

In assessing whether a suspect may be armed and dangerous, an officer may consider "characteristics of the area surrounding the stop, the time of the stop, the specific conduct of the suspect individual, the character of the offense under suspicion, and the unique perspective of a police officer trained and experienced in the detection of crime."  Christian, 33 Va. App. at 714, 536 S.E.2d at 482 (footnote omitted). Courts assess reasonableness from the perspective of a reasonable officer on the scene, making allowance for the necessity of split-second decisions.  See Graham v. Connor, 490 U.S. 386, 396-97 (1989).[25]

In Scott, we approved a pat-down search of a suspect who had reportedly brandished a firearm in a public place.  The report came from an anonymous source which identified only the

_____

(1979) (citations omitted); Wechsler v. Commonwealth, 20 Va. App. 162, 170, 455 S.E.2d 744, 748 (1995).

[25] Simply viewing a bulge, without any other indicia of dangerousness, does not permit the officer to conduct a weapons frisk.  See Stanley v. Commonwealth, 16 Va. App. 873, 877, 433 S.E.2d 512, 514-15 (1993).  But if other suspicious conduct exists, such as the suspect's attempt to conceal the bulge or similar circumstances suggesting danger, the officer may perform a weapons frisk.  See Troncoso v. Commonwealth, 12 Va. App. 942, 945, 407 S.E.2d 349, 350-51 (1991).

suspect's appearance and location.  The weapons frisk was nonetheless "warranted for the officer's protection and the protection of the public" given the immediate and potentially deadly risk the suspect posed.  Scott, 20 Va. App. at 729-30, 460 S.E.2d at 613.

Here, a contemporaneous report by a concerned citizen said three black males in the white Honda had been disorderly and one of them had brandished a firearm.  When questioned directly about having a gun, Jackson conspicuously attempted to hide under his crossed arms a bulge that a trained officer immediately believed to be a weapon.  The officers, therefore, did not act unreasonably by suspecting the bulge "might be" a firearm.  Simmons, 217 Va. at 556, 231 S.E.2d at 221.

We also reject Jackson's argument that the investigatory detention and weapons frisk amounted to a full custodial arrest. To protect themselves during a valid Terry stop, police officers have a right to draw their weapons, to handcuff a suspect, or even to threaten to use force if the circumstances reasonably warrant it.  See generally Thomas v. Commonwealth, 16 Va. App. 851, 857, 434 S.E.2d 319, 323 (1993), aff'd en banc, 18 Va. App. 454, 444 S.E.2d 275 (1994).  A Terry stop involves

> "a police investigation 'at close range,'
> when the officer remains particularly
> vulnerable in part because a full custodial
> arrest has not been effected, and the
> officer must make 'a quick decision as to
> how to protect himself and others from
> possible danger.'"

<u>Servis v. Commonwealth</u>*, 6 Va. App. 507, 519, 371 S.E.2d 156, 162 (1988) (quoting <u>Michigan v. Long</u>, 463 U.S. 1032, 1053 (1983)) (emphasis in original). If a suspect is dangerous, "he is no less dangerous simply because he is not arrested." <u>Id.</u>

Coercive measures, therefore, do not "convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances." <u>Johnson v. Commonwealth</u>, 20 Va. App. 49, 55, 455 S.E.2d 261, 264 (1995); <u>see</u> <u>also</u> <u>Harris v. Commonwealth</u>, 27 Va. App. 554, 566, 500 S.E.2d 257, 263 (1998). Police officers exceed their authority under <u>Terry</u> only when their methods go beyond that reasonably needed to "confirm or dispel" their suspicions. <u>Hamlin</u>, 33 Va. App. at 501-02, 534 S.E.2d at 366. Questions of scope, whether in terms of duration or the extent of coercion, must be referred back to the basic reasonableness standard. When "'evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.'" <u>Washington</u>, 29 Va. App. at 15, 509 S.E.2d at 517 (quoting <u>United States v. Sharpe</u>, 470 U.S. 675, 685 (1985)).

In this case, the officers ordered Jackson out of the car to frisk him only after they came to the reasonable conclusion that he was hiding a weapon —— likely the very one that had been brandished earlier. The only way to confirm or dispel that suspicion was to conduct a limited weapons search. Given the circumstances they faced at that time of night, we find nothing

- 70 -

unreasonable about the officers unholstering their weapons during the frisk and ordering Jackson out of the car. Thus, we reject Jackson's contention that the officers went beyond the boundaries of Terry during their detention and weapons frisk of Jackson.

Having found the weapon, the officers had probable cause to believe Jackson was the black male who had reportedly brandished a firearm outside the bar. By placing him under arrest at that time, the officers gained the corollary authority to conduct a search incident to that arrest. United States v. Robinson, 414 U.S. 218, 224 (1973) ("It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment."). For these reasons, the trial court correctly refused to suppress either the weapon found during the pat down or the crack cocaine found during the search incident to arrest.

## III.

Neither the initial stop of the white Honda, the investigatory detention and weapons frisk of Jackson, nor the search incident to Jackson's arrest constitutes a violation of the Fourth Amendment's proscription against "unreasonable searches and seizures." The trial court, therefore, did not err in denying Jackson's suppression motion.

Affirmed.

Benton, J., dissenting.

The United States Supreme Court's recent decision in Florida v. J.L., 529 U.S. 266 (2000), could not be clearer. Without a dissent, the Court "h[e]ld that an anonymous tip lacking indicia of reliability . . . does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm." Id. at 274.

I believe the majority misreads the import of J.L. when concluding that the decision turned upon a finding that the informant had not relayed to the police information about criminal conduct. Answering "[t]he question . . . whether an anonymous tip that a person is carrying a gun, is without more, sufficient to justify a police officer's stop and frisk of that person," 529 U.S. at 268, the Supreme Court noted that "'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'" Id. at 270 (quoting Alabama v. White, 496 U.S. 325, 329 (1990)). On facts virtually identical to this case, the Court concluded the informant's tip was not proved reliable and reached the holding recited above.

If, as the majority opinion here suggests, the issue in J.L. concerned the failure of the informant's tip to convey evidence of criminal conduct, the resolution of that case would not have required any discussion about the informant's reliability. In that circumstance, regardless of the informant's reliability, the officer would have been operating

only on a bare suspicion and would not have had a basis to detain J.L.  See Terry v. Ohio, 392 U.S. 1, 27 (1968) (holding that a police officer may not detain a person for investigative purposes based on "his inchoate and unparticularized suspicion or 'hunch'" that criminal activity may be occurring).  See also Brown v. Texas, 443 U.S. 47 (1979).  Significantly, the Supreme Court's decision in J.L. notes that "[a]part from the tip, the officers had no reason to suspect any of the three [men] of illegal conduct."  Id. at 268 (emphasis added).  Therefore, the majority opinion's assertion that the tip in J.L. failed to convey information about criminal conduct is simply wrong.

Explaining further the deficiency in the proof of the reliability of the informant's tip, the Supreme Court noted the following:

> The tip in the instant case lacked the moderate indicia of reliability present in White and essential to the Court's decision in that case. . . .  All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J. L.  If White was a close case on the reliability of anonymous tips, this one surely falls on the other side of the line.

J.L., 529 U.S. at 271.  Indeed, the Supreme Court engaged in an extended discussion of the anonymous informant's reliability in J.L. precisely because the tip disclosed criminal conduct and might have supported a detention if the informant was proved to

- 73 -

be reliable.  See Adams v. Williams, 407 U.S. 143, 146-47 (1972).

Although all nine justices joined the J.L. opinion, see 529 U.S. at 274 (Kennedy, J., and Rehnquist, C.J. concurring, and noting "I join in the opinion in all respects"), the concurring opinion also refutes the interpretation the majority opinion in this case gives to J.L.  Specifically, the concurring opinion posits as follows:

> An anonymous telephone tip without more is different, however, for even if the officer's testimony about receipt of the tip is found credible, there is a second layer of inquiry respecting the reliability of the informant that cannot be pursued.  If the telephone call is truly anonymous, the informant has not placed his credibility at risk and can lie with impunity.  The reviewing court cannot judge the credibility of the informant and the risk of fabrication becomes unacceptable.
>
> On this record, then, the Court is correct in holding that the telephone tip did not justify the arresting officer's immediate stop and frisk of respondent. There was testimony that an anonymous tip came in by a telephone call and nothing more.  The record does not show whether some notation or other documentation of the call was made either by a voice recording or tracing the call to a telephone number.  The prosecution recounted just the tip itself and the later verification of the presence of the three young men in the circumstances the Court describes.

529 U.S. at 275.

Rarely are the facts of two cases as congruent as the facts in J.L. and this case.  As in J.L., the officer in this case

- 74 -

received information from his dispatcher concerning a report from an anonymous person. As in J.L., the testimony indicates an anonymous informant said that a man brandished a firearm in a public place. See 529 U.S. at 268 (noting that an anonymous caller reported that a young man "was carrying a gun"). As in J.L., the testimony indicates the anonymous informant described the gender, race, and location of the accused. As in J.L., the officer did not see a gun before detaining the man. Finally, as in J.L., the circumstances surrounding the anonymous informant's tip were not sufficient to negate the substantial risk of fabrication.

The similarities between J.L. and this case extend beyond the basic facts. Indeed, the two cases present the same Fourth Amendment concerns that troubled the Supreme Court. As in J.L., the officers' suspicion that Jackson was unlawfully carrying a weapon arose solely from a call made from an unknown location by an unknown caller. "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, . . . 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'" 529 U.S. at 270 (citation omitted).

The notion that the police could "infer that [the tip] . . . came from a concerned citizen making a contemporaneous, eyewitness report" merely because the tip alleges "an open and

obvious crime" is precisely the type of analysis that J.L. rejects.  Nothing about such a tip provides a basis upon which anyone might conclude that the anonymous informant is either honest or providing reliable information.  A plain reading of J.L. discloses that the Supreme Court, in a footnote, summarily disposed of the thesis advanced by the majority opinion in this case when the Court ruled that "[t]he mere fact that a tip, if true, would describe illegal activity does not mean that the police may make a Terry stop without meeting the reliability requirement."  J.L., 529 U.S. at 273 n.*.  As in J.L., the tip in the present case lacks indicia of reliability.

The majority in this case accepts the Commonwealth's suggestion to disregard J.L. and to rely on this Court's decision in Scott v. Commonwealth, 20 Va. App. 725, 460 S.E.2d 610 (1995), to create some type of exception for guns.  I believe that decision is not supportable.  First, Scott was, in my view, wrongly decided, see 20 Va. App. at 730-32, 460 S.E.2d at 613-14 (Benton, J., dissenting and noting that "[t]he record in this case contains no basis upon which anyone could have determined that the invisible, unknown informant was reliable or had a basis to know anything other than the presence of the defendant, or someone similarly dressed, in the laundromat").  Second, Scott was decided in 1995, five years before its similar facts were presented to the Supreme Court in J.L..  Third, in cases involving the application of constitutional principles,

the Supremacy Clause, U.S. Const. Art. VI, cl.2, does not allow state court decisions to trump decisions of the United States Supreme Court. Reynoldsville Casket Co. v. Hyde, 514 U.S. 749, 750-51 (1995); Harper v. Virginia Dep't of Taxation, 509 U.S. 86, 100 (1993); Kessler v. Department of Public Safety, 369 U.S. 153, 172 (1962).

I would also note that the Commonwealth pursued, and the Supreme Court of Virginia rejected, an argument similar to that advanced in this case. See Harris v. Commonwealth, 262 Va. 407, 551 S.E.2d 606 (2001). There, as here, "the Commonwealth does not expressly concede the applicability of the holding in J.L. to the facts of this case." Id. at 414, 551 S.E.2d at 609. There, as here, the Commonwealth argued that the anonymous informant's tip about a gun provided a heightened justification to support a detention. Id. at 416, 551 S.E.2d at 611. Rejecting this Court's decision that the officer could use the tip as a basis for conducting a frisk for the officer's safety, see Harris v. Commonwealth, 33 Va. App. 325, 334, 533 S.E.2d 18, 22 (2000), the Supreme Court reversed the conviction. The Court noted that the officer's detention of Harris was contrary to the ruling in J.L. and rejected the Commonwealth's argument as one that "bootstraps the legitimate concern for law enforcement officers' safety, which permits a protective search of a legally detained suspect, to serve as the basis for detaining the suspect." Harris, 262 Va. at 416, 547 S.E.2d at 611.

- 77 -

The United States Supreme Court specifically rejected the type of firearm exception that the Commonwealth argued in Harris and in this case and that the majority opinion now resurrects from Scott. The Court unambiguously held as follows:

> [A]n automatic firearm exception to our established reliability analysis would rove too far. Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun. . . . If police officers may properly conduct Terry frisks on the basis of bare-boned tips about guns, it would be reasonable to maintain under the above-cited decisions that the police should similarly have discretion to frisk based on bare-boned tips about narcotics. As we clarified when we made indicia of reliability critical in Adams and White, the Fourth Amendment is not so easily satisfied.

J.L., 529 U.S. at 272-73 (citations omitted). These principles are equally applicable to a circumstance in which an anonymous informant says he observed the commission of an "open and obvious illegality." Even in that circumstance, "[i]f the telephone call is truly anonymous, the informant has not placed his credibility at risk and can lie with impunity." Id. at 275 (Kennedy, J., and Rehnquist, C.J., concurring). In the absence of a "verifiable explanation of how the informant came to know of the information in the tip," Ramey v. Commonwealth, 35 Va. App. 624, 631, 547 S.E.2d 519, 523 (2001), there still remains "a second layer of inquiry respecting the reliability of

the informant that cannot be pursued." J.L., 529 U.S. at 275 (Kennedy, J., and Rehnquist, C.J., concurring).

The Supreme Court has unanimously rejected the Commonwealth's "imminent danger" exception for firearms, and the Court "demand[s]" an "indicia of reliability . . . for a report of a person carrying a firearm." Id. at 274 (emphasis added). Because this case is clearly controlled by the Supreme Court's decision in J.L., I would reverse the conviction. Therefore, I dissent.